MATTHEW J. MATERN (SBN 159798)
mmatern@maternlawgroup.com
MATTHEW W. GORDON (SBN 267971)
mgordon@maternlawgroup.com
ERIN R. HUTCHINS (SBN 346557)
ehutchins@maternlawgroup.com
MATERN LAW GROUP, PC
2101 E. El Segundo Boulevard, Suite 403
El Segundo, California 90245
Telephone: (310) 531-1900
Fax: (310) 531-1901

Attorneys for Plaintiff
BARBARA SANCHEZ, individually and on
behalf of all others similarly situated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA SANCHEZ, an individual, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> CHILDREN'S HOSPITAL LOS ANGELES, a California corporation; RETIREMENT BENEFITS COMMITTEE OF THE CHILDREN'S HOSPITAL LOS ANGELES EMPLOYEES' 401(K) PLAN; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF <br><br> **COMPLAINT FOR:** <br><br> 1. Breach of Fiduciary Duties of Prudence and Loyalty <br><br> 2. Breach of Fiduciary Duty to Investigate and Monitor Investments and Covered Services Provider <br><br> 3. Prohibited Transactions <br><br> 4. Breach of Fiduciary Duty to Monitor Excessive Fees <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

-1-

## NATURE OF THE ACTION

1.    This action seeks redress for breaches of fiduciary duty by defendants CHILDREN'S HOSPITAL LOS ANGELES ("CHLA"), a California corporation; RETIREMENT BENEFITS COMMITTEE OF THE CHILDREN'S HOSPITAL LOS ANGELES EMPLOYEES' 401(K) PLAN ("PLAN COMMITTEE"); and DOES 1 through 50, inclusive (collectively, "DEFENDANTS"), with respect to CHLA's 401(k) Plan (the "Plan").  Plaintiff BARBARA SANCHEZ ("PLAINTIFF") brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. section 1001, *et seq.* ("ERISA") against DEFENDANTS, on behalf of herself and all other similarly situated current and former participants and beneficiaries of the Plan during the time period beginning six years prior to the filing of the complaint through the date of class certification ("the Class") for DEFENDANTS' breach of their fiduciary duties and other violations with respect to the management, operation, and administration of the Plan.  Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## INTRODUCTION

2.    This action is brought on behalf of current and former employees, participants, or beneficiaries of DEFENDANTS' Plan to recover losses due to DEFENDANTS' mismanagement of the Plan and certain selected funds and engaging in prohibited transactions with a party in interest.  Employees and former employees in America rely heavily on 401(k) plans for retirement savings.  Unlike traditional defined-benefit pension plans, which provide guaranteed payouts for life and where the employer assumes the investment risks and pays the fees and expenses of the investments, 401(k) accounts increase and decrease with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to significant risks including drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover millions of dollars of funds owed back to the Plan on behalf of employees, participants, and beneficiaries of the Plan due to DEFENDANTS' misguided selection of investment options and improper transactions.

These retirement funds are significant to the welfare of the Class.

3.       Federal law offers employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. section 401 ("401(k) plans").  These plans provide employees investment options with tax benefits that inure to the benefit of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the ERISA.

4.       DEFENDANTS chose to accept the benefits of federal and state tax deferrals for their employees via their 401(k) plan, and the owners and executives of DEFENDANTS' organizations have benefitted financially for years from the same tax benefits.  However, DEFENDANTS have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits and compensation taken from Plan participants by DEFENDANTS.

5.        The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34), that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2024, the Plan had 7,850 total participants with account balances and $821,056,474 in total assets.

6.       ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries.  An ERISA fiduciary must discharge their responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use.  29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*.  Importantly, a fiduciary's duties include a continuing duty to monitor fees and expenses of selected investments and to remove imprudent ones.  *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

7.       DEFENDANTS breached their fiduciary duties of prudence and loyalty to the Plan by failing to appropriately select and monitor the Plan's guaranteed income fund. Guaranteed income funds differ from many other investment funds in that they pay

participants a contractually guaranteed rate.  Substantially similar products were available from other providers that would have provided far higher returns to Plan participants.  Had DEFENDANTS monitored and evaluated the returns on the Plan's guaranteed income fund, they would have realized that the fund was an underperforming fund throughout the relevant time period and that the Plan's parties in interest were benefitting from the returns on the guaranteed income fund, at the cost of the Plan's participants.

8.    CHLA and the PLAN COMMITTEE also had a concomitant fiduciary duty to monitor and supervise contracted parties.  DEFENDANTS breached their fiduciary duties of prudence and loyalty to the Plan by allowing a party in interest to improperly benefit for its provision of services to the Plan and receive unreasonable and excessive compensation from managing the stable value account.  Substantially similar investment products were available to the Plan throughout the relevant time period from other providers that would have provided the Plan's participants with equivalent or higher returns at a substantially lower cost and without improperly benefiting a party in interest.

9.    Additionally, DEFENDANTS breached their fiduciary duties of prudence and loyalty by failing to monitor the Plan's fees and expenses.  DEFENDANTS caused the Plan to pay excessive fees and expenses associated with recordkeeping and, as a result, the Plan compensated recordkeepers who were also parties in interest from the retirement savings of Plan participants in excessive amounts, thereby diminishing the value of the participants' retirement funds without justification.

10.    PLAINTIFF was injured during the relevant time period by DEFENDANTS' flawed processes, inadequate monitoring, and prohibited transactions in breach of their fiduciary duties.  As a result of DEFENDANTS' actions, participants invested in subpar investment vehicles and paid excessive administrative fees, which resulted in a loss of compounded returns.

11.    The information DEFENDANTS needed to make informed and prudent decisions, including but not limited to information about higher available contractually guaranteed rates, was readily available when the decisions were made.  DEFENDANTS

COMPLAINT

however failed to make prudent decisions and breached their fiduciary obligations.

12. PLAINTIFF, individually and as the representative of a putative Class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to enforce DEFENDANTS' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, PLAINTIFF seeks to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

13. PLAINTIFF brings this action for declaratory, injunctive, and monetary relief pursuant to ERISA section 502(a)(3), 29 U.S.C. section 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

14. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

16. This Court has personal jurisdiction over DEFENDANTS because they transact business in this District, reside in this District with their principal address in Los Angeles, California, have significant contacts with this District, the Plan is believed to be administered in this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because many alleged violations of ERISA took place in this District, the Plan is believed to be administered in this District, and DEFENDANTS conduct business in this District and reside or may be found in this District with their principal address in Los Angeles, California.

Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **PARTIES**

18.   PLAINTIFF resides in Los Angeles, California, and is an employee of CHLA and has worked for CHLA during the relevant time period.  PLAINTIFF was and is a participant in the Plan under 29 U.S.C. § 1002(7) during the relevant time period and, upon information and belief, invested in the some or all of the funds which are at issue in this action.  More specifically, PLAINTIFF invested in the Plan's guaranteed income fund, also known as a stable value fund, through Prudential Retirement Insurance and Annuity Company ("Prudential").  PLAINTIFF was damaged by DEFENDANTS' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

19.   PLAINTIFF has standing under 29 U.S.C. § 1132(a)(1) and (a)(2) to bring this action on behalf of the Plan's participants and beneficiaries because DEFENDANTS' reckless and insouciant actions caused actual harm to an ERISA plan in which PLAINTIFF participates.  PLAINTIFF suffered an injury in fact by, inter alia, being deprived of a high quality, reasonably priced, and secure stable value investment option.  DEFENDANTS are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

20.   Defendant CHLA is the current sponsor and administrator of the Plan and maintains its principal place of business at 4650 Sunset Boulevard, Mail Stop #1, Los Angeles, California 90027.  Per the Plan's Form 5500s filed between 2019 and 2025 (each, a "Form 5500"), CHLA operates and has operated as a sponsor and administrator and/or fiduciary of the Plan.

21.   On information and belief, DEFENDANT PLAN COMMITTEE is the committee that manages and oversees the Plan, and orders ERISA audits of the Plan.

22.   Thus, on information and belief, DEFENDANTS are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have the sole authority to amend or terminate, in whole or part, the Plan, and have discretionary authority to control the

operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available.

23. The true names and capacities of DOES 1 through 50, inclusive, are unknown to PLAINTIFF at this time, and PLAINTIFF therefore sues such DOE defendants under fictitious names. PLAINTIFF is informed and believes, and thereon alleges, that each defendant designated as a DOE is in some manner highly responsible for the occurrences alleged herein, and that PLAINTIFF's and the Class' injuries and damages, as alleged herein, were proximately caused by the conduct of such DOE defendants. PLAINTIFF will seek leave of the Court to amend this complaint to allege the true names and capacities of such DOE defendants when ascertained.

24. Though not named as defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. According to the CHLA's Form 5500s, Prudential Retirement Insurance and Annuity Company and Prudential Bank & Trust, F.S.B. serve as custodians to the Plan for certain investments and Prudential Retirement Insurance and Annuity Company serves as the insurance carrier for the Plan. These entities are collectively referred to as "Prudential." The custodians hold the Plan's investment assets and execute investment transactions. In 2022, Prudential sold its full-service retirement business to Empower Annuity Insurance Company of America, also known as Empower Retirement ("Empower"), and the Plan converted to the Empower platform on February 2, 2024. Prudential and Empower are each a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14).

## DEFENDANTS' FIDUCIARY OBLIGATIONS

25. Under ERISA, a fiduciary's duty is akin to the duty of a trust fiduciary. *Tibble*, 575 U.S. at 530.

26. ERISA and common law trusts impose strict fiduciary duties of loyalty and prudence upon DEFENDANTS as retirement plan fiduciaries. Pursuant to 29 U.S.C. § 1104(a)(1)(A), the duty of loyalty requires a plan fiduciary to "discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

27. Further, under 29 U.S.C. § 1104(a)(1)(B) and common law, the duty of prudence requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

28. A fiduciary's duties include a continuing duty to monitor investments and associated fees and expenses and to remove imprudent ones. *Tibble,* 574 U.S. at 530.

29. Additionally, fiduciaries have a duty not to engage in prohibited transactions. 29 U.S.C. § 1106.

30. 29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

31. ERISA also imposes co-fiduciary duties and liabilities on plan fiduciaries. More specifically, 29 U.S.C. § 1105(a) states that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan…if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or…if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or… if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

32. 29 U.S.C. § 1132(a)(2) and common law authorize a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. To state an ERISA claim for a breach of the fiduciary duties of prudence and loyalty imposed by 29 U.S.C. § 1104, a "plaintiff must make a prima facie showing that the defendant acted

as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

33.   Section 1109(a) and common law provide "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); *see also Eaves v. Penn,* 587 F.2d 453, 463 (10th Cir. 1978).

## DOCUMENTS RELIED UPON FOR ALLEGATIONS IN THE COMPLAINT

34.   PLAINTIFF has relied upon publicly available information and limited documents provided by DEFENDANTS to PLAINTIFF, including quarterly statements, Notices of Investment Returns & Fee Comparison, the Summary Plan Description, the Plan's Annual Form 5500 reports filed during the relevant time period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), and other publicly available Form 5500 reports.

## FACTUAL ALLEGATIONS

### *The Plan*

35.   The Plan was established effective January 1, 2002.  The Plan is a "defined contribution plan," within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of CHLA who have met the service requirements of the Plan.  As of December 31, 2024, the Plan had 7,850 total participants with account balances and $821,056,474 in net assets.

36.   In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts.  Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses.  *See* 29 U.S.C. § 1002(34).

37.   PLAINTIFF and the Class are participants in and beneficiaries of the Plan

during the relevant time period.

### DEFENDANTS Failed to Properly Select and Monitor the Plan's Guaranteed Income Fund

38.     One of the largest assets in the Plan is the Prudential Guaranteed Income Fund ("PGIF").  On information and belief, the PGIF is a group annuity product.  The PGIF is a type of stable value fund.  In recognition of the importance of the fund in the Plan's investment lineup, a cautious and discerning fiduciary would have taken great care in selecting and monitoring this investment option.  However, DEFENDANTS failed to do so.

39.     A stable value fund is a unique investment available only in ERISA defined contribution plans and certain other tax-advantaged plans.  A stable value fund is a conservative, capital preservation investment product typically composed of high quality, low risk investments.  It is designed to provide steady, positive returns and to pay a contractually guaranteed return known as a "crediting rate."  The crediting rate is set by the contract and may be reset at predetermined intervals.[1]

40.     A stable value account in a retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that it provides consistent returns over time.  It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short to intermediate term bond fund.  Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time.  This enables fund providers to offer better crediting rates and to guarantee participants will not lose money by guaranteeing the fund transacts at book value.  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.

---

[1]  *See,* generally, Stable Value Investment Association, Knowledge, https://stablevalue.org/knowledge (follow links for "Glossary").

COMPLAINT

41.     In most cases, stable value products make use of special guaranteed investment contracts known as "GIC" or "wraps" that have their own risk and return characteristics.[2]  In the vast majority of cases, stable value funds are not mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or, (iii) a synthetic fund.  The differences between the various types of funds are critical from a fiduciary standpoint.

42.     The PGIF, the stable value fund selected by DEFENDANTS, is a type of a general account product subject to the terms of an investment contract between CHLA and Prudential/Empower.  The PGIF is not a mutual fund.  Large retirement plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.  General account products, such as PGIF, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently *must* offer the highest rates.

43.     On information and belief, the crediting rate for the PGIF was set in advance by Prudential/Empower and reset as provided in the contract between CHLA and Prudential/Empower.  Prudential/Empower is compensated in connection with the PGIF when general account investment returns exceed the interest credited on contract balances which is almost always in excess of 200bps or 2%.[3]  This is typically referred to as the "spread," *i.e.*, the difference between the crediting rate amounts Prudential paid to participants and the returns generated on the pooled assets.  Prudential/Empower may earn fee revenue plus the foregoing compensation if a plan has agreed to pay contract charges, which are sometimes paid with respect to plan/participant recordkeeping and distribution services.  On information and belief, Prudential/Empower is also compensated with liquidity fees, market value adjustment protection margins, and proprietary revenue enhancements.

---

[2] *Id.* at https://www.stablevalue.org/wp-content/uploads/Stable-Value-FAQ.pdf ("The key difference between a GIC and a contract value wrap contract is that under a contract value wrap contract the ownership of the invested assets are owned by the plan…").

[3] https://www.bloomberg.com/news/articles/2013-03-06/prudential-says-annuity-fees-would-make-bankers-dance?embedded-checkout=true

COMPLAINT

44.    The crediting rate is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.  DEFENDANTS had an opportunity and duty to evaluate the stable value fund in advance.  Thus, this is not a case of judging an investment with the benefit of hindsight.  DEFENDANTS knew or should have known, from the outset, that Prudential/Empower provided better crediting rates for the identical stable value fund (the PGIF) and that substantially similar products were available offering significantly higher crediting rates.  Yet, DEFENDANTS settled for a low crediting rate for the PGIF at the expense of the Class.

45.    DEFENDANTS did not have a prudent process for selecting or monitoring the performance of the PGIF.  Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants.  For example, a prudent fiduciary would have compared the PGIF to the stable value funds offered by Prudential/Empower's major competitors, the largest of which is TIAA Cref, which offered much better returns (*see* Table 1 below).  A prudent fiduciary also would have negotiated with Prudential/Empower to get its best available rates such as the IBEW 400 plan did, as outlined in Table 1 below.

46.    The Plan fiduciaries had a duty to monitor the cost of the PGIF.  The Plan fiduciaries knew that Prudential/Empower would be compensated by the spread, the difference between the return to the participants and Prudential's earnings of the stable value fund placed in its general account.  To illustrate the substantial losses during the relevant time period, the excess spread between the crediting rate Prudential/Empower provided to members of the Class and the crediting rate provided by its competitors, TIAA Cref, MassMutual, and Prudential IBEW 400, is shown in Table 1 below:

-12-

COMPLAINT

**Table 1**

| Year | CHLA's Net Crediting Rate[4] | MassMutual's Net Crediting Rate[5] | TIAA's Net Crediting Rate[6] | Prudential IBEW 400's Net Crediting Rate[7] | Fixed Annuity Assets in PGIF[8] | Excess Spread Between PGIF and MassMutual | Excess Spread Between PGIF and TIAA | Excess Spread Between PGIF and IBEW 400 |
|---|---|---|---|---|---|---|---|---|
| 2019 | 1.50% | 4.50% | 4.80% | 6.80% | $82,227,982 | $616,710 | $678,381 | $1,089,521 |
| 2020 | 1.50% | 4.10% | 4.25% | 6.80% | $68,131,380 | $1,771,416 | $1,873,613 | $3,610,963 |
| 2021 | 1.50% | 4.00% | 4.25% | 6.80% | $70,140,022 | $1,753,501 | $1,928,851 | $3,717,421 |
| 2022 | 1.50% | 4.50% | 4.85% | 6.80% | $69,031,197 | $2,070,936 | $2,312,545 | $3,658,653 |
| 2023 | 1.50% | 5.60% | 6.50% | 6.80% | $72,684,502 | $2,980,065 | $3,634,225 | $3,852,279 |
| 2024 | 2.15% | 4.80% | 5.50% | 6.80% | $57,633,458 | $,1527,287 | $1,930,721 | $2,679,956 |
| 2025 | 2.15% | 5.30% | 5.25% | 6.80% | $55,000,000 | $1,299,375 | $1,278,750 | $1,918,125 |

47.    While not all information is publicly available for comparison purposes, limited documentation shows that Prudential/Empower provided better crediting rates ***for the identical stable value fund (the Prudential GIF)*** to other plans.  In addition, plan participants of the Jack Henry & Associates, Inc., Savings/Retirement Plan received a better

---

[4] CHLA's crediting rate for the PGIF from 2019-2022 is not publicly available and therefore inaccessible for to PLAINTIFF for the time period prior to her enrollment in the Plan, which is unlike many of the other crediting rates such as the TIAA-Cref crediting rate. Therefore, PLAINTIFF estimates the 2019-2022 crediting rates on the basis of the 2023 crediting rate as reflected in PLAINTIFF's Quarterly Statement for the Plan.

[5] MassMutual's figures were obtained from the Fi360 Morningstar Database (now known as Broadridge, https://www.broadridge.com/hub/fiduciary-governance-solutions/), Great Gray Trust Company Form 5500, and other public documents compiled by consulting expert; see also complaints filed in *Grink, et al. v. Virtua Health Inc., et al.*, Case No. 1:24-cv-09919 (D.N.J. Oct. 18, 2024); *Reeves, et al. v. Maersk Inc., et al.,* Case No. 1:25-cv-12422 (D.Mass Sept. 2, 2025); *Laurino, et al. v. The Valley Hospital, et al.*, Case No.  2:25-cv-15263 (D.N.J Sept. 4, 2025).

[6] https://fluenttech.tiaa.org/pdf/factsheet/878094101-TIAAPRC.pdf.

[7] Crediting rate listed in Local Union 400 IBEW's Form 5500s from 2019-2023.  The crediting rates for 2024 and 2024 are assumed as the rate remained the same from 2019-2023.

[8] The current value of the Plan's interest under this contract in the general account at year end is listed in each year's Form 5500.  As CHLA's Form 5500 for 2025 is not yet available, that amount is assumed based on the information from previous years.

-13-

COMPLAINT

crediting rate for the *identical product* (the PGIF) from Prudential/Empower. According to data from the Fi360 stable value fund database, PGIF's crediting rates offered via consultants were much higher than the crediting rate provided to DEFENDANTS' Plan.[9]

48.    If DEFENDANTS had diligently examined the stable value fund market, they would have obtained a significantly higher crediting rate than even the highest PGIF rate during the relevant time period. According to publicly available information, several stable value funds from Prudential/Empower's major competitors had crediting rates of at least 3.00%—and often even higher—throughout the relevant time period, including but not limited to TIAA Cref, IBEW 400 and MassMutual (*see* Table 1). The Plan fiduciaries had a duty to monitor the cost of the PGIF and to compare returns with these competitor stable value funds. The Plan fiduciaries knew that Prudential/Empower would be compensated by the spread, and therefore Prudential/Empower would not be motivated to offer higher rates to the Plan. DEFENDANTS are obligated to negotiate with Prudential/Empower for better crediting rates and to shop for comparable stable value funds offering higher contractual rates.

49.    TIAA Cref, IBEW 400, and the PGIF are general account products with comparable liquidity constraints and MassMutual is a slightly more stable separate account with similar liquidity constraints. Therefore, the crediting rates provided by TIAA Cref, IBEW 400, and MassMutual are proper benchmarks for comparison. Both operate as fixed annuity products, which generate returns at a contractually fixed interest rate. The TIAA fund's crediting rates are indicative of what a reasonable crediting rate is for the type of stable value fund at issue—thereby rendering the TIAA fund a meaningful benchmark. As general account products, the high returns are the plan's get for the give: the high risks involved. However, TIAA Cref provided the high returns and the PGIF did not.

50.    Additionally, Prudential/Empower's other major competitor, MassMutual, provided significantly higher contractual returns. MassMutual's stable value fund offered a

---

[9] *See* complaint filed in *Jacobsen et al v. Long Island Community Hospital*, Case No. 2:24CV00386 (E.D.N.Y. Jan. 18, 2024).

crediting rate between 3.91% and 4.68% from March 2017 to March 2020, and above 4% thereafter, all of which is higher than the crediting rate offered by the PGIF throughout the relevant time period. The MassMutual Products are all separate account products, which have lower risk than the PGIF, yet they all offered higher crediting rates.

51. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated: the product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows from the date the product is selected what the returns will be at least three months in advance. The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than a bond fund. Consequently, a stable value product that performs well generally continues to perform well in a stable manner. A stable value product that performs poorly, such as the Prudential/Empower product, generally continues to perform poorly in a stable manner. A prudent fiduciary—that is, a fiduciary that monitors the investment and understands the pricing mechanism—would have known that the PGIF was underperforming and, being a *stable* value product, would continue to underperform in a stable manner.

52. DEFENDANTS, to have a viable methodology, had to monitor and evaluate the returns on the stable value product on, *at minimum*, a yearly basis, such as to compare them to the returns of the dominant player in the industry. Had DEFENDANTS done anything prudent to monitor and evaluate the returns—such as comparing the Plan returns to the returns of other leading stable value providers—DEFENDANTS would have learned that the Prudential/Empower fund, in addition to being a general account product, was an underperforming fund for the entirety of the relevant time period. Had DEFENDANTS done even a minimal amount of due diligence, they would have immediately recognized that this was a severely underperforming product and would have had no option but to remove the PGIF option from the Plan.

53. This is particularly significant here, where Prudential/Empower, the stable

COMPLAINT

value provider, was also the recordkeeper, insurance company, and manager and holder of the Plan's investments. General account stable value funds can be tremendously profitable for the issuing insurance company, because of the spread. The profit to Prudential/Empower and the corresponding cost to the Plan should have been taken into account in selecting and setting Prudential/Empower's compensation as manager and holder of the Plan's investments.

54. DEFENDANTS did not have to scour the marketplace to find a better performing fund. The terms and rates of stable value funds are published and readily available. All they had to do was look. DEFENDANTS simply did not bother to find a better deal for the Plan participants. They therefore did not exercise even a minimal amount of due diligence.

55. This breach of fiduciary duty resulted in a loss (before compounding) in excess of approximately $45 million of participants' retirement savings (*see* Table 1). This significant loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be in advance.

56. . A stable value product that performs well generally continues to perform well, in a stable manner. A prudent fiduciary would have known that the PGIF would underperform and that, being a stable value product, it would continue to underperform. DEFENDANTS should not have selected the PGIF. Certainly, as it continued to underperform, DEFENDANTS should have removed and replaced it.

### *DEFENDANTS Engaged in Prohibited Transactions*

57. Pursuant to 29 U.S.C. § 1002(14), a "party in interest" to an employee benefit plan includes "any fiduciary," including administrators and custodians, and "a person providing services" to the plan. Pursuant to CHLA's 2024 Form 5500, Prudential/Empower

serves as the Plan's insurance carrier, is a service provider for the Plan, is the recordkeeper for the Plan, and receives direct and indirect compensation from the Plan.  Accordingly, Prudential/Empower is a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14).

58.    Further, as stated above, the PGIF is a general account annuity.  CHLA's 2024 Form 5500 identifies the PGIF as a "group annuity contract" with unallocated funds.  Under the arrangement between the Plan and Prudential/Empower, Plan participants' assets become general account liabilities of Prudential/Empower as the insurer, and the insurer credits a declared crediting rate (2.15% as of the third quarter of 2025) while retaining the spread between investment returns and the crediting rate.  Thus, since participant assets become general account liabilities, the transactions between Prudential/Empower and the Plan constitute an ongoing extension of credit between the Plan and a party in interest, a sale or exchange of property between the Plan and a party in interest, and a transfer of Plan assets to a party in interest, in violation of 29 U.S.C. § 1006(a)(1).

59.    Prudential/Empower and its funds are also clearly a party in interest as there is potential for a conflict of interest because Prudential/Empower—a trustee, custodian and recordkeeper of the Plan, and also as the issuer of the PGIF—may use its authority to cause itself or an affiliate to receive compensation.  Indeed, Prudential/Empower received $322,558 in direct compensation in 2024, in addition to undisclosed indirect compensation, according to the 2024 Form 5500.  Prudential/Empower charges and receives fees for performing the recordkeeping function.  Thus, the PGIF is a "prohibited transaction" under ERISA.  *See* 29 U.S.C. § 1106(a)(l)(C).

60.    In addition, because Prudential/Empower is a party in interest, the contract with Prudential/Empower and compensation to Prudential/Empower in connection with the Plan is unreasonable and involves self-dealing as alleged herein, in violation of 29 U.S.C. § 1108(b).  Prudential/Empower is both the recordkeeper for the Plan and an insurer for the Plan.  As such, Prudential/Empower is a fiduciary dealing with Plan assets for its own benefit, is acting for a party with adverse interests, and is improperly receiving consideration

in connection with transactions involving the assets of the Plan (*i.e.*, the spread fees), in violation of ERISA.  29 U.S.C. § 1106(b)(1) – (b)(3).

61.    DEFENDANTS caused the Plan to engage in the annuity transactions relative to the PGIF with actual or constructive knowledge that the transactions constituted a direct or indirect furnishing of services between Prudential/Empower and the Plan.

62.    DEFENDANTS, as fiduciaries, are responsible for verifying that ERISA's prohibited transaction exemptions *(i.e.,* Prohibited Transaction Exemption ("PTE") 2020-02 84-24 and 77-9) apply to the insurance products they put in the Plan.  This is especially relevant here, as DEFENDANTS are engaging a party in interest.

63.    The PGIF does not qualify for a prohibited transaction exemption because, *inter alia,* the contract does not meet the Impartial Conduct Standards ("ICS").  For example, the PGIF does not satisfy the ICS "care obligation" because the low returns for the single-entity credit risk and liquidity risk of the PGIF do not reflect the required care, skill, prudence, and diligence (similar to the prudent person fiduciary standard).  The PGIF also does not satisfy the ICS "loyalty obligation" or the ICS "reasonable compensation limitation" because the PGIF involves undisclosed spreads and indirect compensation that place the financial interests of the insurers and their affiliates over those of retirement investors.[10]  Indeed, Mark Grier, Vice Chairman of Prudential Financial, Inc., stated that Prudential receives more than 2 percentage points of fees from the assets that are part of its annuity business.[11]  *See* 29 U.S.C. § 1108.

64.    In addition, PTE 84-24 and 77-9 do not apply to general account contracts, contracts where the insurer is also the recordkeeper, or contracts where the spread compensation is undisclosed or unreasonable.  Furthermore, the PGIF does not qualify for an exemption because Prudential/Empower, the insurer, engaged in self-dealing as detailed herein.  *See* 29 U.S.C. § 1108.

---

[10] https://www.warren.senate.gov limo/media/ doc/senator_ warrens_ annuity report_ -_ sept_ 2024. pdf

[11] https://www.bloomberg.com/news/articles/2013-03-06/prudential-says-annuity-fees-would-make-bankers-dance?embedded-checkout=true

-18-

***DEFENDANTS Caused the Plan to Pay Prudential/Empower Excessive***

***Administrative Fees***

65.    As stated above, Prudential/Empower is a party in interest that provided recordkeeping services to the Plan.

66.    DEFENDANTS have a duty to prudently select and monitor compensation paid to covered service providers.  Courts have made it clear that a fiduciary must ensure that "no more than reasonable compensation is paid" for a party in interest's services, and that a fiduciary must "consider the compensation received by the party 'from all sources in connection with the services it provides to a covered plan pursuant to' the contract, not just the compensation the party receives directly from a plan." *Bugielski v. AT&T Servs., Inc*. 76 F.4th 894, 912 (9th Cir. 2023) (quoting 29 C.F.R. § 2550.408b-2(a)(3)).

67.    As stated by the Supreme Court, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

68.    The U.S. Department of Labor ("DOL") guidance has also emphasized the importance of prudently selecting service providers.[12]  The DOL has observed that:

> [T]he responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided.  In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be

_____

[12] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

COMPLAINT

able to demonstrate compliance with ERISA's fiduciary standards.

69. Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

70. The cost of recordkeeping services typically depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $500,000 account balance is the same for a participant with $5,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

71. When selecting a recordkeeper, a fiduciary of a large plan like the Plan must solicit competitive bid proposals from several recordkeepers in order to obtain the best possible price. The plan fiduciary should require the recordkeeper to identify not only the recordkeeping services and their cost, but also the cost of proprietary products—that is, investments offered by the recordkeeper or its affiliates—that the Plan must select.

72. To monitor recordkeeping costs, it is customary that a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter.

73. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct

COMPLAINT

payments, income from stable value funds, fees from separate accounts, or other compensation from other sources.

74.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years and monitor recordkeeping costs regularly within that period.

75.    Table 2 below illustrates the substantial losses to Plan participants resulting from DEFENDANTS' failure to prudently select and monitor administrative fees charged by Prudential/Empower and ensure the administrative fees were reasonable:

**Table 2**[13]

| Year | Number of People in CHLA's Plan | Administrative Costs Per Person | Administrative Fees Paid to Prudential/Empower from CHLA's Plan | Damages based on overpayment above $30 per person[14] |
|---|---|---|---|---|
| 2019 | 6746 | $79.57 | $536,773 | $334,393 |
| 2020 | 6738 | $95.38 | $642,672 | $440,532 |
| 2021 | 6925 | $116.93 | $809,752 | $602,002 |
| 2022 | 7090 | $91.69 | $650,090 | $437,390 |
| 2023 | 7339 | $85.29 | $625,921 | $405,751 |
| 2024 | 7850 | $111.31 | $873,786 | $638.286 |

76.    In this case, based on information currently available to PLAINTIFF regarding the Plan's features and the nature of the administrative services provided by Prudential/Empower, the Plan's active participant level was between 6,738 and 7,850 during

---

[13] Information for Table 2 was obtained from CHLA's Form 5500s.
[14] *See* https://admin316.com/solo-401k-administration-costs/ ($15–$50 per participant per year is common); https://bpp401k.com/wp-content/uploads/2016/04/VCM-Roadmap-to-Understanding-Retirement-Plan-Fees.pdf.;

the relevant time period.  Based on the recordkeeping market, the charge for recordkeeping should have been approximately $30 per participant per year for the relevant time period.

77.    Nonetheless, during the relevant period, DEFENDANTS allowed Prudential/Empower to receive compensation for providing administrative services ranging between $79.57 per participant to $116.93 per participant—far greater than the $30 per participant per year fees charged for comparable plans.[15]

78.    In addition to direct compensation paid to Prudential/Empower for recordkeeping services to the Plan, the Plan's annual Form 5500 filings indicate that Prudential/Empower received indirect compensation from the Plan, particularly the PGIF as set forth above, as well as substantial spread income on the PGIF as set forth above.

79.    Plaintiff estimates that the spread income that Prudential/Empower received from the PGIF ranged in the millions (*see* Table 1).  DEFENDANTS failed to consider the additional compensation that Prudential/Empower received from spread income on the PFIG in determining whether the total compensation that Prudential/Empower received was reasonable.

80.    DEFENDANTS should have been aware of this potential for abuse and monitored for it.  They failed to do that and the Class Members suffered because of it.

81.    Each dollar that DEFENDANTS wasted was one less dollar in participants' accounts, dollars that would have generated returns and built larger retirement savings. Those lost returns compound over time so each wasted dollar matters greatly.  The DOL estimates that over thirty-five years, a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[16]

## CLASS ACTION ALLEGATIONS

82.    ERISA authorizes any plan participant or beneficiary to bring an action on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's

---

[15] *See* https://filetransfer.nashville.gov/portals/0/sitecontent/Finance/docs/Treasury/ Meeting%20Materials/457%20Fee%20Presentation-Metro%20Nashville%202020.pdf/

[16] *See* DOL, Emp. Benefits Sec. Admin., "A Look at 410(k) Plan Fees," 1-2 (September 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

-22-

COMPLAINT

breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

83. Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), PLAINTIFF seeks to certify a class action on behalf of participants and beneficiaries of the Plan. PLAINTIFF seeks to certify the following Class, and to be appointed as the representative of the Class:

> All participants in or beneficiaries of the Children's Hospital Los Angeles Employees' 401(k) Plan during the time period beginning six years prior to the filing of the initial complaint in this matter through the date of judgment, except DEFENDANTS ("CLASS MEMBERS").

84. This action meets the requirements of Federal Rules of Civil Procedure, Rule 23, and is certifiable as a class action for the following reasons:

a. The CLASS MEMBERS are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2024, the Plan had approximately 7,850 participants with account balances.

b. Common questions of law and fact exist as to all CLASS MEMBERS and predominate over any questions solely affecting individual CLASS MEMBERS. Among the questions of law and fact common to the Class are:

- Whether DEFENDANTS are fiduciaries of the Plan;
- Whether DEFENDANTS breached their fiduciary duty of prudence with respect to the Plan;
- Whether DEFENDANTS breached their fiduciary duty of loyalty with respect to the Plan;
- Whether DEFENDANTS breached their duty to monitor other fiduciaries and parties of interest to the Plan;

● Whether the selection of the PGIF as a stable value fund was objectively prudent under the circumstances;

● Whether DEFENDANTS engaged in prohibited transactions under ERISA; and

● The extent of damage sustained by CLASS MEMBERS and the appropriate measure of damages.

85.    PLAINTIFF's claims are typical of the CLASS MEMBERS' claims because PLAINTIFF's claims arise from the same events, practices and/or course of conduct as other CLASS MEMBERS.  PLAINTIFF will adequately protect the interests of the CLASS MEMBERS and has retained counsel experienced in class action litigation and ERISA claims.

86.    PLAINTIFF has no interests that conflict with those of the CLASS MEMBERS.

87.    DEFENDANTS do not have any unique defenses against PLAINTIFF that would interfere with PLAINTIFF's representation of the CLASS MEMBERS.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual CLASS MEMBERS may be relatively small, the expense and burden of individual litigation make it impossible for CLASS MEMBERS to individually redress the wrongs done to them.

89.    There will be no difficulty in the management of this action as a class action.

## FIRST  CAUSE OF ACTION

### Breach of Fiduciary Duties of Loyalty and Prudence

### (Against All DEFENDANTS)

90.    PLAINTIFF incorporates and re-alleges the foregoing paragraphs as though set forth herein.

91.    DEFENDANTS were and are fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§ 1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan sponsor or administrator, a named fiduciary under the Plan, performed discretionary Plan-related

-24-

COMPLAINT

fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

92.    As fiduciaries of the Plan, DEFENDANTS were required, pursuant to ERISA §4 04(a)(1), 29 U.S.C. § 1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

93.    Common law and ERISA's duty of prudence required DEFENDANTS to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 530.

94.    As described above, DEFENDANTS failed to act prudently and in the best interest of the Plan and its participants and breached their fiduciary duties in a number of ways. DEFENDANTS failed to make prudent decisions regarding the Plan's investments and what was in the best interest of Plan participants. More specifically, DEFENDANTS failed to select other, better performing guaranteed investment stable value products, including failing to consider the PGIF's largest competitors. Furthermore, DEFENDANTS did not have a credible basis to conclude that the investment professionals responsible for carrying out its investment strategy were competent to do so successfully, and failed to appropriately monitor and supervise their performance. A prudent fiduciary in possession of publicly available information regarding the PGIF would have removed that investment option and replaced it with a more prudent alternative.

95.   Additionally, DEFENDANTS engaged in prohibited transactions with party in interest Prudential/Empower, as detailed herein.  A prudent fiduciary would have ascertained that its transactions were prohibited by applicable law and refrained from engaging in such transactions for the benefit of Plan participants and beneficiaries.

96.   Furthermore, DEFENDANTS caused the Plan to pay excessive fees to its recordkeeper and party in interest, Prudential/Empower, as set forth above.  A prudent fiduciary would have engaged in benchmarking and monitored recordkeeping costs regularly.  By failing to do so, DEFENDANTS wasted CLASS MEMBERS' money in the form of overpayments to Prudential/Empower in significant amounts.

97.   DEFENDANTS knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties.  DEFENDANTS knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a), and for such other equitable or remedial relief the Court deems appropriate, as will be determined at trial after the completion of discovery in this action.

98.   As a direct and proximate result of these breaches, the Plan, PLAINTIFF and CLASS MEMBERS suffered substantial losses in the form of lower returns on their investments than they would have otherwise experienced and excessive administrative fees, among other losses.  Additionally and regardless of the losses incurred by PLAINTIFF or any CLASS MEMBERS, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, DEFENDANTS and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of DEFENDANTS' breaches of their fiduciary duties, and such other appropriate equitable relief as the Court deems proper.

///

-26-
COMPLAINT

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duty to Investigate and Monitor Investments and Covered**

**Service Providers**

**(Against Defendant CHLA and DOES 1 through 50)**

99.    PLAINTIFF incorporates and re-alleges the foregoing paragraphs as though set forth herein.

100.    DEFENDANTS had overall oversight responsibility for the Plan and control over the Plan's investment options through their authority to limit or remove the other Plan fiduciaries.

101.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

102.    DEFENDANTS also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to DEFENDANTS.

103.    DEFENDANTS breached their fiduciary monitoring duties by, among other things:

a.    failing to monitor and evaluate the performance of the Plan's investments, including the PGIF;

b.    failing to monitor the Plan's fees and expenses;

c.    failing to monitor and evaluate transactions with parties in interest, such as the prohibited transactions detailed herein with Prudential/Empower;

d.    failing to monitor and evaluate the performance of other Plan fiduciaries or have

-27-
COMPLAINT

a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to invest in imprudent investments, as detailed herein;

e. failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the substantial losses in returns, to the detriment of the Plan and the Plan's participants' retirement savings, including PLAINTIFF and CLASS MEMBERS; and

f. failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

104. As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiff, and CLASS MEMBERS suffered millions of dollars in losses. Had DEFENDANTS complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

105. Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), DEFENDANTS are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

**THIRD CAUSE OF ACTION**

**Prohibited Transactions**

**(Against All DEFENDANTS)**

106. PLAINTIFF incorporates and re-alleges the foregoing paragraphs as though set forth herein.

107. Under ERISA, a plan fiduciary "shall not cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A)

-28-

COMPLAINT

and (C).

108.   DEFENDANTS are and were fiduciaries with respect to the Plan.

109.   DEFENDANTS caused the Plan to engage in the annuity transactions set forth above with knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and party in interest, Prudential/Empower.

110.   DEFENDANTS caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted direct or indirect furnishing of services between Prudential/Empower and the Plan.

111.   When DEFENDANTS caused the Plan to engage in the annuity transactions, Prudential/Empower was a "party in interest," including because Prudential/Empower was a fiduciary of the Plan, an insurer of the Plan, and a "person" providing services to the Plan. 29 U.S.C. §1002(14).   DEFENDANTS knew of that fact when they caused the Plan to engage in the annuity transactions at issue.

112.   DEFENDANTS knowingly participated in the breach of fiduciary duties by Prudential/Empower, knowing that such acts and omissions were a breach, and enabled Prudential/Empower's commission of a breach by failing to lawfully discharge their fiduciary duties, and failed to make any reasonable efforts under the circumstances to remedy the breach.   Thus, they are liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a) and would be liable even if they were deemed non-fiduciaries.

## FOURTH CAUSE OF ACTION

**Breach of Fiduciary Duty to Monitor Excessive Fees**

**(Against Defendant CHLA and DOES 1 through 50)**

113.   Plaintiff incorporates and re-alleges the foregoing paragraphs as though set forth herein.

114.   DEFENDANTS were obligated to discharge their fiduciary duties solely in the interest of Plan participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan.   *See* 29 U.S.C. § 1104(a)(1)(A)(ii).

115.   In investing and managing the Plan's assets, DEFENDANTS were permitted to

-29-

COMPLAINT

incur only appropriate and reasonable costs.

116. As alleged above, DEFENDANTS failed to defray the Plan's recordkeeping expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's recordkeeping expenses were excessive, resulting in losses to the Plan's participants.

117. Moreover, DEFENDANTS failed to prudently monitor and control the Plan's recordkeeping expenses. A prudent fiduciary would have conducted regular benchmarking, negotiated lower fees, and/or solicited competitive bids to ensure the reasonableness of such expenses.

118. Each DEFENDANT also knowingly participated in the breach of the duties of the other DEFENDANTS, knowing that such acts or omissions were a breach, enabled the other DEFENDANTS to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other DEFENDANTS, and failed to make any reasonable efforts under the circumstances to remedy the breach. Thus, each DEFENDANT is liable for the losses caused by the breach of each of its co-fiduciaries under 29 U.S.C. § 1105(a).

119. DEFENDANTS are liable under 29 U.S.C. § 1109(a) to make good to CLASS MEMBERS any losses to the Plan resulting from the breaches of fiduciary duties alleged herein and are subject to other equitable or remedial relief as appropriate. Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to the Plan's participants to date.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF, on behalf of the Plan and all CLASS MEMBERS, prays that the Court grant the following relief:

A.    Certify the Class, appoint Plaintiff as Class Representative, and appoint Matern Law Group, PC as Class Counsel;

B.    Find and declare that DEFENDANTS have breached their fiduciary duties as

-30-

COMPLAINT

described above;

C.    Find and adjudge that DEFENDANTS are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

E.    Order DEFENDANTS to provide an accounting necessary to determine the amounts DEFENDANTS must make good the Plan under §1109(a);

F.    Find and adjudge that DEFENDANTS must disgorge all sums of money received from their use of assets of the Plan;

G.    Impose a constructive trust on any monies by which DEFENDANTS were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause DEFENDANTS to disgorge such monies and return them to the Plan;

H.    Surcharge against DEFENDANTS and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, imprudent, excessive, and/or in violation of ERISA;

I.    Order equitable restitution against DEFENDANTS;

J.    Award to PLAINTIFF and CLASS MEMBERS their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

K.     Order the payment of interest to the extent it is allowed by law; and

L.    Grant such other relief as the Court deems equitable and just.

///

///

///

///

///

///

///

-31-

COMPLAINT

DATED: January 28, 2026

Respectfully submitted,

MATERN LAW GROUP, PC


By:    */s/ Matthew J. Matern*
MATTHEW J. MATERN
MATTHEW W. GORDON
ERIN R. HUTCHINS
Attorneys for Plaintiff
BARBARA SANCHEZ, individually and on behalf of all others similarly situated


## DEMAND FOR JURY TRIAL

PLAINTIFF, on behalf of herself and all others similarly situated, hereby demands a jury trial with respect to all issues triable of right by jury.


DATED: January 28, 2026

Respectfully submitted,

MATERN LAW GROUP, PC


By:    */s/ Matthew J. Matern*
MATTHEW J. MATERN
MATTHEW W. GORDON
ERIN R. HUTCHINS
Attorneys for Plaintiff
BARBARA SANCHEZ, individually and on behalf of all others similarly situated

-32-

COMPLAINT